1

2

3

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

10

11

12

13

14

15

16

```
LIAM FELTON,                    ) Case No. CV 13-8449-JPR
                                )
             Plaintiff,         )
                                )
        vs.                     ) MEMORANDUM OPINION AND ORDER
                                ) AFFIRMING COMMISSIONER
                                )
CAROLYN W. COLVIN, Acting       )
Commissioner of Social          )
Security,                       )
                                )
             Defendant.         )
_____)
```

17

18  **I.   PROCEEDINGS**

19        Plaintiff seeks review of the Commissioner's final decision

20  denying his application for Social Security disability insurance

21  benefits ("DIB").   The parties consented to the jurisdiction of

22  the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).

23  This matter is before the Court on the parties' Joint

24  Stipulation, filed August 6, 2014, which the Court has taken

25  under submission without oral argument.   For the reasons stated

26  below, the Commissioner's decision is affirmed.

27

28

**II.   BACKGROUND**

Plaintiff was born on October 11, 1959.  (Administrative Record ("AR") 147.)  He completed 11th grade (AR 46), and he worked as a home attendant caring for a paralyzed man and as a janitor at an office (AR 59-61).

On February 28, 2011, Plaintiff submitted an application for DIB, alleging that he had been unable to work since March 31, 2008, because of glaucoma and asthma.  (AR 68, 147-48, 168.) After his application was denied, he requested a hearing before an Administrative Law Judge.  (AR 82.)  A hearing was held on May 23, 2012, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert ("VE").  (AR 42-66.)  In a written decision issued June 25, 2012, the ALJ found Plaintiff not disabled.  (AR 31-38.)  On September 19, 2013, the Appeals Council denied Plaintiff's request for review.  (AR 1-5.)  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.

2

Admin., 466 F.3d 880, 882 (9th Cir. 2006)).   To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).   "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.   42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   The Five-Step Evaluation Process

An ALJ follows a five-step sequential evaluation process to assess whether someone is disabled.   20 C.F.R. § 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).   In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.   § 404.1520(a)(4)(i).   If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments

3

1  significantly limiting his ability to do basic work activities;
2  if not, a finding of not disabled is made and the claim must be
3  denied. § 404.1520(a)(4)(ii).  If the claimant has a "severe"
4  impairment or combination of impairments, the third step requires
5  the Commissioner to determine whether the impairment or
6  combination of impairments meets or equals an impairment in the
7  Listing of Impairments ("Listing") set forth at 20 C.F.R., Part
8  404, Subpart P, Appendix 1; if so, disability is conclusively
9  presumed and benefits are awarded. § 404.1520(a)(4)(iii).

10     If the claimant's impairment or combination of impairments
11  does not meet or equal one in the Listing, the fourth step
12  requires the Commissioner to determine whether the claimant has
13  sufficient residual functional capacity ("RFC")[1] to perform his
14  past work; if so, he is not disabled and the claim must be
15  denied. § 404.1520(a)(4)(iv).  The claimant has the burden of
16  proving he is unable to perform past relevant work.  Drouin, 966
17  F.2d at 1257.  If the claimant meets that burden, a prima facie
18  case of disability is established.  Id.  If that happens or if
19  the claimant has no past relevant work, the Commissioner bears
20  the burden of establishing that the claimant is not disabled
21  because he can perform other substantial gainful work available
22  in the national economy. § 404.1520(a)(4)(v).  That
23  determination comprises the fifth and final step in the
24  sequential analysis. § 404.1520; Lester, 81 F.3d at 828 n.5;
25  Drouin, 966 F.2d at 1257.

26  _____

27     [1] RFC is what a claimant can do despite existing exertional
    and nonexertional limitations. § 404.1545; see Cooper v.
28  Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

1          B.    The ALJ's Application of the Five-Step Process

2          At step one, the ALJ found that Plaintiff had not engaged in

3    substantial gainful activity since March 31, 2008, the alleged

4    onset date. (AR 33.) At step two, he concluded that Plaintiff

5    had the severe impairments of "left eye blindness secondary to

6    glaucoma, chronic obstructive pulmonary disease (COPD) and

7    asthma/emphysema." (Id.) At step three, the ALJ determined that

8    Plaintiff's impairments did not meet or equal any of the

9    impairments in the Listing. (AR 34.) At step four, he found

10   that Plaintiff had the RFC to perform light work except that he

11   "must avoid exposure to dust, gases, fumes and other respiratory

12   irritants, work that involves frequent depth perception and

13   peripheral vision, and work with small objects." (Id.) The ALJ

14   concluded that Plaintiff could not perform any of his past

15   relevant work. (AR 36.) Based on the VE's testimony, the ALJ

16   found that Plaintiff could perform the job of advertising-

17   material distributor, which existed in significant numbers in the

18   national economy. (AR 37-38.) Accordingly, he found Plaintiff

19   not disabled. (AR 38.)

20   **V.    DISCUSSION**

21         Plaintiff contends that the ALJ erred in (1) assessing his

22   credibility, (2) formulating his RFC, and (3) determining that he

23   could "sustain work activity and perform a significant number of

24   jobs." (J. Stip. at 6.) For the reasons discussed below, remand

25   is not warranted.

26         A.    The ALJ Properly Assessed Plaintiff's Credibility

27         Plaintiff claims that the ALJ "provide[d] no specific and

28   legitimate reasons to discredit [his] testimony as required by

                                    5

1 | the case law" and "improperly decided [his] RFC before properly
2 | evaluating [his] testimony." (J. Stip. at 14.)

3 |              1.  <u>Relevant background</u>

4 | In a March 31, 2011 Exertion Questionnaire, Plaintiff
5 | reported that he had shortness of breath "from [his] lung disease
6 | and asthma" and also suffered from high blood pressure and
7 | glaucoma. (AR 174.) He could walk about a block before needing
8 | to sit down to rest and could walk an hour before he "just can't
9 | do it anymore." (<u>Id.</u>) Plaintiff lived alone but his daughter
10 | came over to help him wash, cook, clean, and shop. (<u>Id.</u>)

11 | Plaintiff reported that he could not climb stairs or lift
12 | and carry anything weighing more than 10 pounds. (AR 175.) He
13 | could perform housework for about 45 minutes before he needed to
14 | stop "from the shortness of breath an[d] my eye sight." (AR
15 | 176.) He said he used a cane "because I can't see when walking
16 | and don't want to fall." (<u>Id.</u>)

17 | At the May 23, 2012 hearing, Plaintiff testified that his
18 | poor eyesight prevented him from working. (AR 47.) He could not
19 | see with his left eye at all and was having problems seeing with
20 | his right eye. (<u>Id.</u>) Plaintiff testified that he could not see
21 | anything small, could not read unless the print was "really, big,
22 | large," and could not tell a fork from a knife unless he felt
23 | them. (AR 48-49.) He listened to the television but did not
24 | watch it because the image was blurred and he "can't even see it"
25 | even if he was sitting only five or six feet away. (AR 55-56.)
26 | Plaintiff, who was sitting about six feet from the ALJ at the

6

hearing,[2] testified that he could clearly see the features of the ALJ's face and could tell whether he was wearing glasses.  (AR 47-48, 55.)  Plaintiff could bathe himself but could not cut his beard.  (AR 50-51.)  He used a cane as a visual aid.  (AR 54.)

Plaintiff testified that he had asthma or COPD and felt short of breath when he lifted "something too heavy" or walked one block; his shortness of breath was worse when he climbed stairs.  (AR 51, 53-54.)  He could not lift anything weighing more than 10 pounds.  (AR 55.)  He did not cook or clean his house and would call someone to help him with those things.  (AR 56-57.)

## 2.   Applicable law

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks omitted).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must determine whether the claimant

---

[2] Although the ALJ twice noted at the hearing that he was about six feet from Plaintiff (AR 47, 56), in his written decision he found that he had been sitting "about 10 feet from" him (AR 21).

has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." _Id._ at 1036 (internal quotation marks omitted). If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the _degree_ of symptom alleged." _Smolen v. Chater_, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. _See_ _Berry v. Astrue_, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. _Lester_, 81 F.3d at 834; _Ghanim v. Colvin_, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014).

In assessing a claimant's credibility, the ALJ may consider (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties. _Thomas v. Barnhart_, 278 F.3d 947, 958-59 (9th Cir. 2002); _Smolen_, 80 F.3d at 1284. If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." _Thomas_, 278 F.3d at 959.

8

1

### 3.   Analysis

2        After summarizing Plaintiff's subjective testimony and the
3   medical evidence (AR 33-36), the ALJ found that Plaintiff's
4   "medically determinable impairments could reasonably be expected
5   to cause the alleged symptoms" but that his "statements
6   concerning the intensity, persistence and limiting effects of
7   these symptoms are not credible to the extent they are
8   inconsistent with" his RFC (AR 36).  As discussed below, the ALJ
9   gave sufficient, clear and convincing reasons for discounting
10  Plaintiff's credibility.

11       First, the ALJ discounted Plaintiff's credibility based on
12  his inconsistent statements regarding his symptoms.  (AR 35.)
13  The ALJ noted that although Plaintiff testified that he was
14  unable to see images on a television that was five or six feet
15  from him (AR 55-56) or distinguish small objects (AR 48), he
16  could "clearly" see the ALJ, who was seated about six feet away
17  during the hearing (AR 47-48, 55-56).  (AR 35.)  The ALJ also
18  noted that Plaintiff said he used a cane because he didn't want
19  to fall (AR 54, 176), but none of the examining or treating
20  physicians had noted that he used an assistive device (see, e.g.,
21  AR 250 (examining physician noting that Plaintiff "is able to
22  ambulate without the need for an assistive device"), 268
23  (treatment note that does not check "Walking Aide" under "Medical
24  Supplies/Equipment" and instead says "NA")).  (AR 35); cf.
25  Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999) (ALJ
26  properly discounted credibility when claimant "walked slowly and
27  used a cane at the hearing" even though no doctor indicated he
28  used or needed assistive device and two doctors noted he did not

1   need one).  The ALJ was entitled to rely on such inconsistencies

2   in discounting Plaintiff's credibility.  See Smolen, 80 F.3d at

3   1284 (in assessing credibility, ALJ may consider "ordinary

4   techniques of credibility evaluation," such as prior inconsistent

5   statements and "other testimony by the claimant that appears less

6   than candid").

7       The ALJ also noted inconsistencies in Plaintiff's reports of

8   how many cigarettes he smoked.  (AR 36.)  Indeed, in November

9   2009, Plaintiff reported smoking a quarter of a pack of

10  cigarettes a day (AR 238); in March 2010, he reported smoking one

11  pack a day (AR 232); in January 2011, he reported that he "quit

12  smoking 2 weeks ago" and had smoked a half a pack of cigarettes a

13  day for 37 years (AR 316); in June 2011, he reported smoking one

14  cigarette a day and having smoked one pack a day for 40 years (AR

15  246); and in October 2011, he reported smoking one cigarette a

16  day (AR 323).  Plaintiff contends that the ALJ should not have

17  relied on this inconsistency to discount his credibility because

18  it reflects only that he succeeded in cutting down his smoking.

19  (J. Stip. at 13.)  But even if the ALJ erred by relying on this

20  inconsistency, it was harmless because his credibility

21  determination was supported by other clear and convincing

22  reasons.  See Carmickle v. Comm'r Soc. Sec. Admin., 533 F.3d

23  1155, 1163 (9th Cir. 2008) (ALJ's errors harmless when they did

24  not "negate the validity" of adverse credibility determination

25  (internal quotation marks omitted)).

26      The ALJ also permissibly discounted Plaintiff's subjective

27  complaints because they were inconsistent with the medical

28  evidence.  Plaintiff complained that he was unable to distinguish

                                    10

the denomination of coins or bills or make out the images on television, but most of his eye examinations, including those conducted by his treating physician, Dr. Miguel Unzueta, showed almost normal vision of 20/30 in the right eye.  (AR 35; <u>see, e.g.</u>, AR 309, 241, 276-77, 281.)[3]  The ALJ further found that Plaintiff's asserted vision limitations conflicted with Dr. Unzueta's finding that Plaintiff could perform work involving "frequent[]" near and far visual acuity.[4]  (AR 35; <u>see also</u> AR 310.)  Moreover, regarding Plaintiff's eyesight, examining physician Soheila Benrazavi opined only that if Plaintiff's left-eye vision was "very poor," then "occupations and activities that require binocular vision or intact depth perception are limited" (AR 251), which was inconsistent with Plaintiff's claims that he was unable to see anything small, could not make out a television image, and could not see well enough to tell a knife from a fork.

---

[3] The ALJ appears to have made a harmless typographical error by stating in his decision that various eye examinations showed Plaintiff's vision to be "30/20" rather than 20/30.  (AR 33-35); <u>see</u> <u>Vision acuity test</u>, MedlinePlus, http://www.nlm.nih. gov/medlineplus/ency/article/003396.htm (last updated Feb. 7, 2013) (vision acuity expressed as fraction with top number indicating distance from chart and bottom number indicating distance at which person with normal eyesight could read same line on chart).  The ALJ correctly noted that Plaintiff's right-eye vision was "almost normal" or "near normal."  (AR 34-35); <u>see</u> <u>Vision acuity test</u>, MedlinePlus, http://www.nlm.nih.gov/ medlineplus/ency/article/003396.htm (20/20 vision is normal).

[4] Plaintiff erroneously states that Dr. Unzueta found that he "could only occasionally perform work activities due to field of vision of the right eye."  (J. Stip. at 12.)  Dr. Unzueta in fact found that Plaintiff could only "occasionally" perform work activities involving "field of vision."  (AR 310.)  The ALJ accommodated that finding in the RFC by precluding Plaintiff from performing jobs involving frequent depth perception and peripheral vision.  (AR 34.)

Such conflicts with the medical evidence are permissible reasons
for discounting Plaintiff's credibility.  See Burch v. Barnhart,
400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical
evidence cannot form the sole basis for discounting pain
testimony, it is a factor that the ALJ can consider in his
credibility analysis."); Carmickle, 533 F.3d at 1161
("Contradiction with the medical record is a sufficient basis for
rejecting the claimant's subjective testimony."); Lingenfelter,
504 F.3d at 1040 (in determining credibility, ALJ may consider
"whether the alleged symptoms are consistent with the medical
evidence").  In any event, even if the ALJ erred by discrediting
Plaintiff's alleged inability to distinguish bills or read, it
was harmless because as discussed in Section C, the VE testified
that Plaintiff could perform the job of advertising-material
distributor even with those limitations.  (AR 62-65); see Stout
v. Comm'r of Soc. Sec., 454 F.3d 1050, 1055 (9th Cir. 2006)
(error harmless when inconsequential to ultimate disability
determination).

    The ALJ also noted that although Plaintiff alleged that he
suffered from debilitating breathing problems, the record showed
that he sometimes failed to follow his prescribed treatment.  (AR
36.)  Indeed, in January 2011, a treating doctor found that
Plaintiff's asthma – which had been "well controlled" since high
school and began worsening after Plaintiff had suffered a cold
two months earlier – was "undercontrolled with current
medication," and he prescribed new medication.  (AR 316-17.)  But
at Plaintiff's next visit, in March 2011, the doctor noted that
he had not been using his new medications as prescribed.  (AR

12

320.)  In May 2011, the doctor noted that Plaintiff's "symptoms
had gotten better since last visit with use of inhaler" (AR 321),
although he apparently still was not taking his full dose of
medication (see AR 322).  In October 2011, Plaintiff complained
that his lung disease had worsened (AR 323), and the doctor again
noted that Plaintiff was not taking his medication as directed
(AR 324).  Such failure to follow prescribed treatment undermines
the credibility of Plaintiff's complaints.  See Smolen, 80 F.3d
at 1284 (in assessing credibility, ALJ may consider "unexplained
or inadequately explained failure to seek treatment or to follow
a prescribed course of treatment").

        Plaintiff argues that the ALJ relied on "meaningless
boilerplate" by stating in his decision that Plaintiff's
statements "concerning the intensity, persistence and limiting
effects of [his] symptoms are not credible to the extent they are
inconsistent with" the RFC assessment.  (J. Stip. at 7.)
Plaintiff further argues that in so finding, the ALJ "puts the
cart before the horse in determining [Plaintiff's] credibility"
by "reject[ing] portions of [his] testimony and statements which
did not comport with the already constructed RFC assessment."
(J. Stip. at 7-8.)  Plaintiff relies on Kilbourne v. Comm'r of
Soc. Sec., Civil No. 09-6367-HA, 2011 WL 1357330 (D. Or. Apr. 11,
2011), which reversed an ALJ's credibility assessment in part
because "the ALJ's reliance upon the perceived inconsistency
between [plaintiff's] testimony and the RFC . . . is error."  Id.
at *4.  In Kilbourne, however, the ALJ failed to provide any
other appropriate reasons for discounting the plaintiff's
credibility.  See id.  Here, by contrast, the ALJ summarized and

                                13

considered Plaintiff's testimony and the medical evidence and provided clear and convincing reasons for discounting his credibility.  As such, even if the boilerplate used by the ALJ did discredit Plaintiff's complaints simply because they were inconsistent with the RFC, it was harmless and not grounds for remand.  See Tipton v. Colvin, No. 1:13-CV-00359-REB, 2014 WL 4773964, at *6 & n.5 (D. Idaho Sept. 24, 2014) (finding, in case using nearly identical boilerplate language, that "though the use of such common boilerplate language runs the risk of 'getting things backwards,' its mere use is not cause for remand if the ALJ's conclusion is followed by sufficient reasoning").

Plaintiff also contends that the ALJ erroneously "only mentioned Glaucoma in the blind eye" even though Plaintiff "has glaucoma in both eyes." (J. Stip. at 9-10.)  But nothing indicates that the ALJ believed Plaintiff's glaucoma was limited to the left eye; rather, he repeatedly refers to Plaintiff's glaucoma and discusses the condition of both eyes. (See AR 33-36.)  He simply found that Plaintiff's right-eye glaucoma was not a severe impairment.

In sum, the ALJ provided clear and convincing reasons for discrediting Plaintiff's subjective complaints.  Because those findings were supported by substantial evidence, this Court may not engage in second-guessing.  See Thomas, 278 F.3d at 959. Plaintiff is not entitled to remand on this ground.

B.   The ALJ Properly Formulated Plaintiff's RFC

Plaintiff contends that in formulating his RFC, the ALJ "failed to adequately consider the full scope of [his] problems with vision with his remaining good eye and failed to properly

14

consider the extent of [his] breathing difficulties and
limitations." (J. Stip. at 20.)

>     1.   Relevant background

On June 24, 2011, Dr. Benrazavi, who was board certified in
internal medicine, performed an internal-medicine evaluation of
Plaintiff at the agency's request. (AR 246-51.) Dr. Benrazavi
found that Plaintiff's left eye was "lazy," his left retina was
not visualized, and a "black spot" was in "the front of the left
eye." (AR 248.) Examination of Plaintiff's right eye was
normal, and his "visual fields" were also "grossly normal."
(Id.) A lung examination revealed reduced breath sounds but was
otherwise normal (id.), and pulmonary function tests showed
"moderate obstruction" (AR 250, 252-53).[5] Dr. Benrazavi opined
that because of Plaintiff's COPD, he was limited to lifting and
carrying 20 pounds occasionally and 10 pounds frequently;
standing and walking six hours in an eight-hour day; sitting for
six hours in an eight-hour day; and working in an environment
that was "reasonably free of dust, fumes and smoke." (AR 251.)
She recommended a "review of [Plaintiff's] ophthalmological
records" to "ascertain the cause of his eye condition and obtain
his true visual acuity" and opined that "[i]f it turns out that
the left eye vision is very poor then occupations and activities
that require binocular vison or intact depth perception are

---

[5] "Pulmonary function tests are a group of tests that
measure how well the lungs take in and release air and how well
they move gases such as oxygen from the atmosphere into the
body's circulation." Pulmonary function tests, MedlinePlus,
http://www.nlm.nih.gov/medlineplus/ency/article/003853.htm (last
updated Dec. 3, 2013).

1  limited."   (<u>Id.</u>)   A vision test conducted that day showed that
2  Plaintiff had 20/70 vision in the right eye and 20/200 vision in
3  the left.  (AR 258.)

4      On July 5, 2011, Dr. L.C. Chiang reviewed Plaintiff's
5  medical records and opined that Plaintiff could lift and carry 20
6  pounds occasionally and 10 pounds frequently and stand and walk
7  for six hours in an eight-hour workday.  (AR 72.)  He noted that
8  Plaintiff had limited near and far acuity and depth perception
9  but unlimited field of vision; he opined that he should "[a]void
10  jobs requiring good vision and binocular vision."  (AR 73.)  Dr.
11  Chiang believed that Plaintiff must avoid concentrated exposure
12  to extreme heat and cold, wetness, humidity, fumes, odors, dust,
13  gases, poor ventilation, and hazards.  (AR 73-74.)

14      On November 9, 2011, treating physician Unzueta completed a
15  "Vision Impairment Residual Functional Capacity Questionnaire."
16  (AR 309-11.)  He listed Plaintiff's diagnoses as ocular
17  hypertension and left-eye amblyopia.[6]  (AR 309.)  He stated that
18  Plaintiff was "legally blind" in his left eye, had 20/30 vision
19  after best correction in his right eye, and had "grossly normal"

20
21
22
        [6] Amblyopia, also called "lazy eye," is the loss of the
23  ability to see clearly through one eye.  <u>Amblyopia</u>, MedlinePlus,
    http://www.nlm.nih.gov/medlineplus/ency/article/001014.htm (last
24  updated Sept. 2, 2014).  Dr. Unzueta wrote "OS" after amblyopia,
    indicating that it existed in the left eye.  (AR 309); <u>see</u>
25  <u>Stedman's Medical Dictionary</u> 1278 (27th ed. 2000) ("O.S." is
    abbreviation for "oculus sinister," meaning left eye).  It is not
26  clear whether he wrote "OS" or "OD," indicating the right eye,
    after "ocular hypertension."  (<u>See</u> AR 309); <u>see also</u> <u>Stedman's</u>
27  <u>Medical Dictionary</u> 1252 (27th ed. 2000) ("O.D." is abbreviation
    for "oculus dexter," meaning right eye).
28

                                16

peripheral visual fields in the right eye.[7] (Id.)  Dr. Unzueta
believed that Plaintiff's condition was "stable" and listed his
symptoms as "legally blind" in the left eye.  (Id.)

Dr. Unzueta opined that Plaintiff could frequently perform
work activities involving "near acuity," "far acuity,"
"accommodation,"[8] and "color vision"; occasionally perform work
activities involving "field of vision"; and rarely perform work
activities involving depth perception.[9]  (Id.)  Plaintiff was
capable of avoiding ordinary hazards in the workplace, "such as
boxes on the floor, doors ajar, [and] approaching people or
vehicles."  (Id.)  Plaintiff had no difficulty walking up or down
stairs.  (Id.)  He could work with large objects but could not
"work with small objects such as those involved in doing
sedentary work."  (Id.)  Plaintiff's symptoms would
"occasionally" interfere with the attention and concentration
needed to perform simple work tasks, but he would not need to
take unscheduled breaks during the workday.  (AR 311.)[10]

_____

[7]  Dr. Unzueta wrote that Plaintiff's peripheral vision
fields "OD," or in the right eye, were grossly normal.  (AR 309.)
Dr. Unzueta's findings regarding Plaintiff's peripheral vision
fields of the left eye are illegible, but they were presumably
limited given that Plaintiff is apparently legally blind in that
eye.  (See id.)

[8] Accommodation is the process by which the eye focuses the
image of an object on the retina.  Stedman's Medical Dictionary 9
(27th ed. 2000).

[9] The form defined "rarely" as one to five percent of the
workday, "occasionally" as six to 33 percent of the workday, and
"frequently" as 34 to 66 percent of a workday.  (AR 310.)

[10] Plaintiff states that "Dr. Janae D. Vickers" reported
that Plaintiff was temporarily disabled for the purposes of

17

1          2.   Applicable law

2          A district court must uphold an ALJ's RFC assessment when

3   the ALJ has applied the proper legal standard and substantial

4   evidence in the record as a whole supports the decision.   Bayliss

5   v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005).   The ALJ must

6   consider all the medical evidence in the record and "explain in

7   [his] decision the weight given to . . . [the] opinions from

8   treating sources, nontreating sources, and other nonexamining

9   sources." § 404.1527(e)(2)(ii); see also § 404.1545(a)(1) ("We

10  will assess your residual functional capacity based on all the

11  relevant evidence in your case record."); SSR 96-8p, 1996 WL

12  374184, at *2 (July 2, 1996) (same).   In making an RFC

13  determination, the ALJ may consider those limitations for which

14  there is support in the record and need not consider properly

15  rejected evidence or subjective complaints.   See Bayliss, 427

16  F.3d at 1217 (upholding ALJ's RFC determination because "the ALJ

17  took into account those limitations for which there was record

18  ────────────────────

19  county general relief benefits (J. Stip. at 4 (citing AR 312)),
    but in fact Vickers is a physician's assistant and her opinion
20  was therefore entitled to less deference than that of a
    physician.   (See AR 312 (indicating "PA" after Vickers's name));
21  § 404.1513(a), (d); Molina, 674 F.3d at 1111 (under agency
    regulations, "only licensed physicians and certain other
22  qualified specialists are considered acceptable medical sources";
    "[p]hysician's assistants are defined as 'other sources,' and are
23  not entitled to the same deference" (alteration, citation, and
    internal quotation marks omitted)).   In any event, Vickers's
24  conclusory statement that Plaintiff would be disabled for three
    months was unsupported by any medical findings and fails to show
25  that Plaintiff should be found disabled for purposes of Social
    Security benefits.   See 42 U.S.C. § 423(d)(1)(A) (disabling
26  impairment must "be expected to result in death or . . . has
    lasted or can be expected to last for a continuous period of not
27  less than 12 months"); Drouin, 966 F.2d at 1257 (same).

28

                                  18

support that did not depend on [claimant's] subjective
complaints"); <u>Batson v. Comm'r of Soc. Sec. Admin.</u>, 359 F.3d
1190, 1197 (9th Cir. 2004) (ALJ not required to incorporate into
RFC any findings from treating-physician opinions that were
"permissibly discounted").  The Court must consider the ALJ's
decision in the context of "the entire record as a whole," and if
the "evidence is susceptible to more than one rational
interpretation, the ALJ's decision should be upheld."  <u>Ryan v.</u>
<u>Comm'r of Soc. Sec.</u>, 528 F.3d 1194, 1198 (9th Cir. 2008)
(internal quotation marks omitted).

                    3.   <u>Analysis</u>

     The ALJ found that Plaintiff retained an RFC for light work
that did not involve exposure to dust, gases, fumes, and other
respiratory irritants; frequent depth perception or peripheral
vision; or working with small objects.  (AR 34.)  In doing so,
the ALJ accurately summarized the medical evidence and accorded
"great weight" to the medical opinions from treating physician
Unzueta, examining physician Benrazavi, and nonexamining
physician Chiang, which comprised all of the medical-opinion
evidence in the record.  (<u>See</u> AR 36.)  Those opinions constitute
substantial evidence in support of the ALJ's RFC assessment.  <u>See</u>
<u>Young v. Comm'r of Soc. Sec.</u>, __ F. App'x __, 2014 WL 6845867, at
*1 (9th Cir. Dec. 5, 2014) (RFC supported by substantial evidence
in part because it was consistent with opinions of examining and
consulting medical sources); <u>Larsen v. Comm'r Soc. Sec. Admin.</u>,
585 F. App'x 484, 485 (9th Cir. 2014) (substantial evidence
supported RFC when doctors' opinions "supported the ALJ's
determination").

                              19

1    Plaintiff does not appear to challenge the ALJ's reliance on
2    those medical opinions or argue that the ALJ failed to properly
3    translate them into an RFC.  Instead, he summarizes several
4    medical records and summarily contends that his "medical
5    condition as set forth in the treating records does not coincide
6    with an RFC finding for Light Work." (See J. Stip. 26; see also
7    id. at 23-26.)  None of the cited evidence, however, establishes
8    that the ALJ's RFC assessment was erroneous.  For example,
9    Plaintiff summarizes Dr. Benrazavi's clinical findings but
10   ignores that she concluded, based on those findings, that
11   Plaintiff could perform work activities that are fully consistent
12   with his RFC. (See J. Stip. at 24; AR 246-51.)  Plaintiff also
13   points to a January 2011 emergency-room note reflecting
14   Plaintiff's complaints of increased breathing problems when
15   walking more than two blocks or climbing stairs. (J. Stip. at
16   24-25.)  But that note also reflects that "[s]ince his high
17   school [Plaintiff's] asthma has been controlled" and it had
18   worsened only in the preceding two months, after Plaintiff
19   suffered from a cold; Plaintiff's examination that day was noted
20   as "completely normal."[11]  (AR 316-17.)  Plaintiff also points to
21   an October 2011 pulmonary-function-test report showing findings
22   consistent with "moderate to severe obstruction" and no
23   significant response to a bronchodilator (J. Stip. at 25-26; AR

24

25          [11] Plaintiff states that this record was dated November 15,
     2010.  (See J. Stip. at 24-25 (citing AR 316-17).)  But it
26   appears that was the date of a previous hospital admission for
     treatment of a "fistula," and the date of the treatment note was
27   actually January 26, 2011. (See AR 316-18 (showing "11/15/2010"
     as "admit" date and "1/26/2011" next to treating physician's
28   name).)

333), but no doctor opined that those findings would result in limitations greater than those reflected in Plaintiff's RFC.  At most, the records cited by Plaintiff establish that the medical evidence could have been susceptible to more than one rational interpretation, which is insufficient to warrant reversal of the Commissioner's decision.  See Molina, 674 F.3d at 1111 ("Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record."); Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (ALJ is "final arbiter with respect to resolving ambiguities in the medical evidence").[12]

Plaintiff's other arguments are equally unavailing.  Plaintiff appears to contend that the ALJ should have included additional limitations in his RFC based on his subjective

[12] Plaintiff notes in his summary of the evidence that Dr. Unzueta found that Plaintiff's symptoms would "occasionally" be severe enough to interfere with attention and concentration needed to perform simple work.  (see J. Stip. at 26 (summarizing Dr. Unzueta's findings at AR 309-11).)  But the only symptom listed on the form was that Plaintiff was "legally blind" in the left eye (AR 309), and it is unclear how that symptom would interfere with Plaintiff's attention and concentration given the vision limitations outlined in his RFC.  Dr. Unzueta also opined that Plaintiff could only "rarely" perform activities involving depth perception (AR 310), while the RFC assessment precluded only work requiring "frequent" depth perception (AR 34).  Any error was harmless, however, because as discussed in Section C, the ALJ's hypothetical to the VE included a limitation to "[n]o work that involved depth perception" (AR 62), and the VE testified that a person with such limitation could still perform other work (AR 64).  See Stout, 454 F.3d at 1055 (error harmless when inconsequential to ultimate nondisability determination).

21

1    complaints (<u>see</u> J. Stip. at 20, 26-28), but as discussed in

2    Section A, the ALJ properly discredited much of Plaintiff's

3    testimony.  The ALJ was not required to consider Plaintiff's

4    discredited allegations in formulating Plaintiff's RFC.  <u>See</u>

5    <u>Bayliss</u>, 427 F.3d at 1217.

6         To the extent Plaintiff contends that he is precluded from

7    performing light work based on Social Security Ruling 83-14, 1983

8    WL 31254 (Jan. 1, 1983) (<u>see</u> J. Stip. at 21), that argument also

9    fails.  The cited portion of Ruling 83-14 merely states that when

10   a person has a visual impairment that causes him to be a hazard

11   to himself or others – such as by tripping over boxes while

12   walking, failing to detect approaching people or objects, or

13   having difficulty walking up and down stairs – the ALJ may need

14   to elicit VE testimony rather than relying on the

15   Medical-Vocational Guidelines at 20 C.F.R. part 404, subpart P,

16   appendix 2.  <u>See</u> 1983 WL 31254 at *4-6; <u>see also</u> <u>Angulo v.</u>

17   <u>Colvin</u>, 577 F. App'x 686, 687 (9th Cir. 2014) ("A vocational

18   expert is only required when there are 'significant and

19   sufficiently severe non-exertional limitations not accounted for

20   in the grid.'").  Here, however, Plaintiff's own treating

21   physician opined that Plaintiff was "capable of avoiding ordinary

22   hazards in the workplace, such as boxes on the floor, doors ajar,

23   [and] approaching people or vehicles."  (AR 310.)  And in any

24   event, as discussed below in Section C, the ALJ properly relied

25   on the testimony of a VE, not the Medical-Vocational Guidelines,

26   to find that Plaintiff could perform a significant number of

27   jobs.

28        Because the ALJ applied the proper legal standard and

substantial evidence supports his RFC finding, remand is not
warranted on this ground.

C.   The ALJ Properly Determined that Plaintiff Could
     Perform a Significant Number of Jobs

Plaintiff asserts that the ALJ's finding that he could
perform a significant number of jobs was not "proper" or "based
on substantial evidence." (J. Stip. at 28.)  Specifically,
Plaintiff contends that the ALJ's hypothetical to the VE "did not
encompass the nature and extent of [his] COPD, emphysema and
asthma" or his vision problems.  (Id. at 29.)  In so arguing,
Plaintiff summarizes many of the medical records he relied on in
arguing that the ALJ erroneously assessed his RFC and repeats his
argument that the ALJ erroneously discounted his credibility.
(See id. at 29-31.)  Plaintiff further contends that the ALJ
erred by "independently determin[ing] that [Plaintiff] could
perform the work of Cashier I, without the input of the
vocational expert."  (Id. at 31.)

1.   Relevant background

At the hearing, the ALJ asked the VE to

[a]ssum[e] a hypothetical claimant with the same
vocational and educational background as [Plaintiff] with
the following limitations.  This person could lift and
carry 20 pounds occasionally, 10 pounds frequently, stand
and walk up to six – at least six out of eight hours, sit
– no limitations on sitting.

Can engage in postural activities on a frequent
basis.  This person . . . should avoid dust, fumes,
gasses [sic] and other lung irritants.  This person is

23

1      blind in one eye, the left eye, so he would have no depth
2      perception.  No work that involved depth perception.  No
3      worth [sic] that required binocular vision or – or a full
4      range of field of vision.

5            This person can only work with large objects.  In
6      his good eye, his vision is limited, so he cannot see
7      small   objects.    So,   for   example,   he   has   trouble
8      distinguishing  –  sitting  on  a  table,  he  would  have
9      trouble distinguishing a knife and a fork and a spoon.
10     He has to do it by feel.  He can see large objects that
11     are nearby.  But – so, no work that involved any fine
12     vision – close up or any vision at . . . anything more
13     than, say, five, six feet away.
14  (AR 62-63.)  In response to the VE's question, Plaintiff
15  testified that he could not see well enough to distinguish among
16  $5, $10, and $20 bills.  (AR 63-64.)  Based on that testimony,
17  the ALJ added that the hypothetical person would be unable to
18  tell the difference between denominations of paper money and
19  could not read or write.  (AR 64.)  The VE testified that she
20  would be "hard pressed" to identify suitable jobs "because of the
21  lifting and the vision part," but she opined that such a
22  hypothetical person could perform the job of advertising-material
23  distributor, which involved handing out printed material and did
24  not require the ability to read.  (Id.)  The VE testified that
25  approximately 1000 such jobs existed regionally and 53,000
26  nationally.  (AR 65.)
27      In his decision, the ALJ specifically discredited
28  Plaintiff's testimony regarding his inability to distinguish

1   coins or paper money, read, or write.  (AR 35-37.)  The ALJ

2   concluded that Plaintiff could perform light work except that he

3   "must avoid exposure to dust, gases, fumes and other respiratory

4   irritants, work that involves frequent depth perception and

5   peripheral vision, and work with small objects."  (AR 34.)  He

6   noted that the VE "testified that given all of these factors the

7   individual would be able to perform the requirements of

8   representative occupations such as advertising material

9   distributor," which existed in numbers "sufficient to be

10  significant."[13]  (AR 37.)  The ALJ further observed,

11       [W]hile the VE could not come up with additional job

12       classifications, this was premised on the hypothetical

13       limitation that [Plaintiff] could not work with "small

14       objects" such as money because he could not distinguish

15       the features of the coins or bills, a limitation I find

16       not credible.  I would note that other types of jobs,

17       such as cashier II (DOT 211.462-010), which requires

18       frequent near acuity, and has no environmental

19       restrictions, would also possible [sic] with the above

20       RFC.

21  (AR 37.)  The ALJ concluded that "[b]ased on the testimony of the

22  vocational expert, . . . [Plaintiff] is capable of making a

23  successful adjustment to other work that exists in significant

24

25       [13] The ALJ erroneously stated that the VE testified that
    153,000 advertising-material-distributor jobs existed nationally,
26  rather than 53,000.  (Compare AR 37 with AR 65.)  Plaintiff has
    not relied on that error in challenging the ALJ's decision.  In
27  any event, it was harmless because as discussed below, 53,000
    national jobs is a significant number.  See Stout, 454 F.3d at
28  1055.

25

numbers in the national economy." (AR 38.) He therefore
concluded that Plaintiff was not disabled. (Id.)

        2.   Analysis

     To the extent Plaintiff challenges the ALJ's determination
that he could perform other work because it was allegedly based
on improper credibility and RFC findings, that argument fails.
As discussed above in Sections A and B, the ALJ's credibility
determination and RFC assessment were proper and supported by
substantial evidence.  The ALJ properly posed a hypothetical to
the VE containing all the limitations he found credible based on
the evidence of record (as well as additional limitations that he
later determined were not credible); in response, the VE
testified that Plaintiff could perform the job of advertising-
material distributor.  (AR 62-64.)  The ALJ was entitled to rely
on the VE's testimony. See Bayliss, 427 F.3d at 1217 (holding
that because "[t]he hypothetical that the ALJ posed to the VE
contained all of the limitations that the ALJ found credible and
supported by substantial evidence in the record," ALJ's "reliance
on testimony the VE gave in response to the hypothetical
therefore was proper").

     The ALJ was also entitled to rely on the VE's testimony to
find Plaintiff not disabled because the advertising-material-
distributor job existed in "significant numbers" in the regional
or national economy.  The Social Security Act states that a
claimant who cannot do his previous work will not be found
disabled if he can "engage in any other kind of substantial
gainful work which exists in the national economy." See 42
U.S.C. § 1382c(a)(3)(B).  The Act defines "[w]ork which exists in

26

significant numbers in the national economy" as "work which
exists in significant numbers either in the region where such
individual lives or in several regions of the country." Id.; see
also Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519, 528 (9th
Cir. 2014) (noting that "'work which exists in the national
economy' can be satisfied by 'work which exists in significant
numbers *either* in the region where such individual lives *or* in
several regions of the country'" (emphasis in original)); see
also 20 C.F.R. § 404.1566(a) ("We consider that work exists in
the national economy when it exists in significant numbers either
in the region where you live or in several other regions of the
country."). Here, the VE testified that approximately 1000
advertising-material-distributor jobs existed regionally and
53,000 existed nationally. (AR 65.) That is a "significant
number" of jobs sufficient to uphold the ALJ's decision. See
Gutierrez, 740 F.3d at 529 (finding 25,000 national jobs
significant); Yelovich v. Colvin, 532 F. App'x 700, 702 (9th Cir.
2013) (finding 900 regional jobs significant); Thomas, 278 F.3d
at 960 (finding 1300 jobs in state significant); Meanel v. Apfel,
172 F.3d 1111, 1115 (9th Cir. 1999) (finding between 1000 and
1500 jobs in local area significant); compare Beltran v. Astrue,
700 F.3d 386, 389-90 (9th Cir. 2012) (as amended) (135 jobs
regionally and 1680 jobs nationally insufficient, but noting that
"[w]e need not decide what the floor for a 'significant number'
of jobs is in order to reach this conclusion").

    Plaintiff also argues that the ALJ "inappropriately, alone,
found that [Plaintiff] could perform the job of Cashier I." (J.
Stip. at 33.) But the ALJ's observation that Plaintiff would

likely be able to perform other jobs given that his RFC was
considerably less limited than the hypothetical does not appear
to have been incorrect.   In any event, the ALJ clearly found that
Plaintiff could perform other work "[b]ased on the testimony of
the vocational expert," not his own conclusion that Plaintiff
could perform additional jobs, such as cashier.   (See AR 38.)
Indeed, even if the ALJ had erroneously relied on his finding
that Plaintiff could perform the cashier job, it was harmless
given his proper finding that Plaintiff could perform the
advertising-materials-distributor job.   See Stout, 454 F.3d at
1055; cf. Yelovich, 532 F. App'x at 702 (ALJ's reliance on VE's
incorrect testimony that claimant could perform two occupations
harmless when ALJ also relied on VE's accurate testimony that
claimant could perform third job).   Remand is not warranted on
this ground.[14]

## VI.   CONCLUSION

Consistent with the foregoing, and pursuant to sentence four
of 42 U.S.C. § 405(g),[15] IT IS ORDERED that judgment be entered
AFFIRMING the decision of the Commissioner, DENYING Plaintiff's

[14] Plaintiff states that the ALJ "indicated after the [VE]
testimony that he could do a bench decision, indicating a
favorable decision, but had other hearings and meetings so would
make the decision later."   (J. Stip. 29.)   The ALJ did state that
he could "probably" issue a bench decision but closed the hearing
without doing so.   (See AR 65-66.)   Contrary to Plaintiff's
contention, however, nothing indicates that such decision would
have been in his favor.   (See id.)

[15] This sentence provides: "The [district] court shall have
power to enter, upon the pleadings and transcript of the record,
a judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the
cause for a rehearing."

request for reversal of the Commissioner's decision, and
DISMISSING this action with prejudice.  IT IS FURTHER ORDERED
that the Clerk serve copies of this Order and the Judgment on
counsel for both parties.


DATED: January 21, 2015

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge